362 F.3d 378
 INDIANA BELL TELEPHONE COMPANY, INCORPORATED d/b/a Ameritech Indiana, Plaintiff-Appellant, Cross-Appellee,
v.
William D. McCARTY, David W. Hadley, and David E. Zeigner, in their capacity as Commissioners of the Indiana Utility Regulatory Commission and not as individuals, Defendants-Appellees, Cross-Appellants, and
AT & T Communications of Indiana, GP, and TCG Indianapolis, Defendants-Appellees, Cross-Appellants.
 No. 03-1123.
 No. 03-1122.
 No. 03-1124.
 United States Court of Appeals, Seventh Circuit.
 Argued September 12, 2003.
 Decided March 5, 2004.
 As Amended on Denial of Rehearing and Rehearing En Banc March 5, 2004.*
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Dennis G. Friedman (argued), Mayer, Brown, Rowe & Maw, Chicago, IL, for Plaintiff-Appellant.
 David L. Steiner, Office of the Attorney General, Indianapolis, IN, David W. Carpenter (argued), Sidley Austin Brown & Wood, Chicago, IL, for Defendants-Appellees.
 Before BAUER, KANNE and EVANS, Circuit Judges.
 KANNE, Circuit Judge.
 
 
 1
 This appeal stems from the interconnection agreement established between Indiana Bell Telephone Company, Incorporated d/b/a Ameritech Indiana ("Ameritech") and AT & T Communications of Indiana, GP and TCG Indianapolis (collectively "AT & T") pursuant to the Telecommunications Act of 1996 ("Act").[1] Because the parties could not reach a consensus regarding the content of the agreement, they submitted it to arbitration before the Indiana Utility Regulatory Commission ("IURC"). 47 U.S.C. § 252(b) (2001). The IURC hammered out the differences and ordered that the agreement be amended to reflect its determinations. The parties redrafted the agreement as directed, and it was approved by the IURC.[2]
 
 
 2
 Ameritech then sought declaratory and injunctive relief from the district court. It argued that various provisions established by the IURC through arbitration and incorporated into the approved agreement violated the Act. The district court granted the request for an injunction in part and denied it in part, remanding certain issues to the IURC for further findings. Ameritech, the IURC Commissioners, and AT & T appealed portions of the district court's order, and those appeals were consolidated for our review.[3] We affirm in part and reverse in part.
 
 I. Background
 
 3
 The Telecommunications Act of 1996 seeks primarily to promote competition in the previously monopoly-driven local telephone service market. See Verizon Communications, Inc. v. FCC, 535 U.S. 467, 475-76, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). It requires the incumbent local telephone service provider[4] (here, Ameritech) to allow new market entrants[5] (here, AT & T) to interconnect with and access the incumbent's network for a fair price. 47 U.S.C. § 251(c); See Verizon, 535 U.S. at 491, 122 S.Ct. 1646. Congress recognized that without allowing new entrants to use the incumbents' local exchange networks[6] and other technology and services, the incumbents would maintain a stranglehold on local telephone service: no new entrant could realistically afford to build from the ground up the massive communications grid the incumbents had developed through years of monopolistic advantage. See Verizon, 535 U.S. at 490, 122 S.Ct. 1646.
 
 
 4
 The Act seeks, with regard to its rate-setting and other features, to "give aspiring competitors every possible incentive to enter local retail telephone markets, short of confiscating the incumbents' property." Id. at 489, 122 S.Ct. 1646. It also requires incumbents to negotiate an agreement, referred to as an "interconnection agreement," with new entrants at their request. 47 U.S.C. § 252(a); See Ill. Bell Tel. Co. v. Worldcom Techs., Inc., 179 F.3d 566, 568-69 (7th Cir.1999) (describing the procedure by which interconnection agreements are reached). The agreement's purpose is to lay out in specific detail what access to network elements the new entrant wishes to purchase from the incumbent, the price to be paid, and other parameters of their relationship. If the parties to the agreement can't come to resolution within a statutorily specified time frame, either party can petition the state utility commission (here, the IURC) to arbitrate the open issues, or, if the state commission refuses to do so, the Federal Communications Commission ("FCC" or "Commission") can step in and resolve the differences between the parties. 47 U.S.C. § 252(b)(1), (e)(5). The duty of the state commissions in arbitration is to uphold the Act and the FCC regulations promulgated under it, ensuring that the interconnection agreement works to foster competition and benefit the public, without discriminating against other would-be entrants. See 47 U.S.C. § 252(c)(1).
 
 
 5
 After a state commission arbitrates the open issues, the parties submit their interconnection agreement reflecting the arbitrated resolutions to the state commission for approval. 47 U.S.C. § 252(e). If either or both parties disagree with the interconnection agreement arbitrated by the state commission, they may seek review in federal district court, as Ameritech did here. 47 U.S.C. § 252(e)(6). The district court's sole responsibility is to determine whether the interconnection agreement meets the requirements of sections 251 and 252 of the Act. Id. On appeal, we review the district court's interpretation of the Act de novo. US W. Communications v. Jennings, 304 F.3d 950, 956 (9th Cir. 2002).
 
 II. Analysis
 
 6
 We turn now to the issues before us on appeal. Each of these issues was contested during the IURC arbitration and decided by the arbitrator, then ordered to become part of the interconnection agreement between the parties. Ameritech argues that the district court erred when it affirmed (1) the IURC's decision to award AT & T the "tandem reciprocal compensation rate" rather than the lower "end-office rate;" and (2) the IURC's determination that Ameritech must splice "dark fiber" for AT & T upon request. As we lay out below, we affirm the district court on both issues appealed by Ameritech.
 
 
 7
 AT & T appeals three of the district court's decisions. First, AT & T argues that the district court erred in remanding for further findings the agreement provisions requiring Ameritech to provide AT & T with combinations of network elements that Ameritech ordinarily combines for itself as well as combinations that it ordinarily does not combine for itself. Second, AT & T states that the district court erred in enjoining the portion of the interconnection agreement requiring Ameritech to perform "acceptance testing" before opening a loop circuit requested by AT & T. Third, AT & T contests the district court's order remanding for further findings the IURC's decision requiring Ameritech to unbundle packet switching. While we affirm the district court's remand on issues one (combination of network elements) and three (packet switching), we reverse on issue two, reinstating the IURC's decision with respect to acceptance testing.
 
 A. Ameritech's Appeal
 1. Tandem Reciprocal Compensation Rate
 
 8
 One term of the interconnection agreement between Ameritech and AT & T covers the price to be paid when a telecommunication (e.g. telephone call, facsimile, modem dial-up, etc.) originates on the network Ameritech built but terminates on AT & T's equipment. Under the Act, not only can AT & T pay to use certain elements of Ameritech's vast telecommunications network, AT & T can build switches of its own, which Ameritech then must allow to interconnect with its network. That way, consumers who use AT & T as their local telephone service provider may call consumers who use Ameritech as their local telephone service provider. However, AT & T must pay Ameritech for its costs in allowing the call to travel through its switch and arrive at its customer's receiver and vice versa. See Ill. Bell Tel. Co., 179 F.3d at 568; 47 U.S.C. § 251(b)(5). The compensation paid by AT & T and Ameritech to each other for transport and termination of telecommunications is called "reciprocal compensation." 47 U.S.C. § 251(b)(5).
 
 
 9
 Problems in calculating the reciprocal compensation rate arise because, as the FCC has recognized, new entrants design their networks and deploy their switches differently than incumbents due to changes in technology. See In re Implementation of the Local Competition Provisions of the Telecomms. Act of 1996, 11 FCC Rcd. 15,499, 16,042, ¶ 1090 (Aug. 8, 1996) ("Local Competition Order"). Incumbents, which usually have older networks and thus older technology, typically route calls from new entrants' customers either through an "end-office switch" (a computer that directly serves the Ameritech customer being called) or a "tandem switch" (a computer hub that connects end-office switches). If Ameritech routes an AT & T customer's call directly through Ameritech's end-office switch, AT & T is charged the "end-office rate." The end-office rate is a lower rate that compensates Ameritech for the cost of end-office switching alone. But, if Ameritech must route the call through a tandem switch, then AT & T pays Ameritech the higher "tandem rate." The tandem rate compensates Ameritech for (1) the tandem switching it performs to route the call to the end-office switch; (2) the transport between the tandem switch and the end-office switch; and (3) the end-office switching that delivers the call to the customer. See MCI Telecomms. Corp., 79 F.Supp.2d at 790 (E.D.Mich.1999).
 
 
 10
 New entrants cannot hope to replicate the incumbents' network switch for switch but, as stated before, have the advantage of newer technology. Thus, a new entrant can typically deploy a single switch in a central location, then lease various elements from the incumbent in order to connect the new entrant's customers to its central switch and the incumbent's end-office switches. In this way, the new entrant is able to serve with one switch a geographic area that the incumbent would serve with a minimum of ten-to-fifteen end-office switches. The new entrant's central switch and leased transport facilities, therefore, "perform functions similar to those performed by an [incumbent's] tandem switch." Local Competition Order, 11 FCC Rcd. at 16,042, ¶ 1090. Hence, if a new entrant can show that its one switch "serves a geographic area comparable to the area served by the [incumbents'] tandem switch," 47 C.F.R. § 51.711(a)(3) (2003), then the new entrant can charge the incumbent the higher tandem rate for calls terminating on the new entrant's network. Otherwise, the new entrant receives the lower end-office rate.
 
 
 11
 The IURC determined that AT & T met the geographic coverage test established by 47 C.F.R. § 51.711(a)(3)[7] and that Ameritech owed AT & T the tandem rate for calls terminating on AT & T's network. Ameritech argues that in awarding AT & T the higher tandem reciprocal compensation rate, the IURC misinterpreted Rule 711(a)(3) to mean that AT & T only had to have the ability to serve and not actually be serving the same geographic area as Ameritech. Because of this purported misapplication of the geographic coverage test, Ameritech argued below that the portion of the interconnection agreement establishing AT & T's entitlement to the tandem reciprocal compensation rate should be enjoined. The district court disagreed and affirmed the IURC's determination.
 
 
 12
 Ameritech first challenges the affirmance of the tandem reciprocal compensation rate award on the basis that the district court applied the wrong standard of review. The district court found that whether AT & T met the geographic coverage test established by 47 C.F.R. § 51.711(a)(3) was a question of fact to be overturned only if the IURC's determination was arbitrary or capricious. Questions of fact, Ameritech agrees, are reviewed by the district court under the arbitrary and capricious standard. Southwestern Bell Tel. Co. v. Apple, 309 F.3d 713, 717-18 (10th Cir.2002); US W. Communications, Inc. v. Hamilton, 224 F.3d 1049, 1052 (9th Cir.2000). But, Ameritech argues, whether the IURC properly interpreted the FCC regulation to require an examination into AT & T's "ability to serve" the same geographic area as Ameritech rather than AT & T's "actual service" of the same geographic area was a question of law to be reviewed de novo. See Hamilton, 224 F.3d at 1052 (stating that courts consider de novo a state commission's interpretation of the Act and the FCC's regulations).
 
 
 13
 We agree with the argument advanced by Ameritech that the district court should have conducted a de novo review of the IURC's interpretation of the regulation in question. See, e.g., MCI Telecomms. Corp., 79 F.Supp.2d at 791 (applying a de novo standard of review to the new entrant's challenge to the state commission's interpretation of 47 C.F.R. § 51.711(a)(3)). However, we affirm the district court judge's decision because the IURC interpreted the regulation correctly to mean that the tandem reciprocal rate applies when the new market entrant's network has the ability to serve, although may not yet be actually serving, the same geographic area as the incumbent.
 
 
 14
 There is precious little case law interpreting 47 C.F.R. § 51.711(a)(3), and the few district court cases dealing specifically with the issue before us are either inapposite or unpersuasive. For guidance, we turn to the Memorandum Opinion and Order issued by the Chief of the Wireline Competition Bureau, acting with authority delegated by the FCC to forge an interconnection agreement between telecommunications providers in Virginia. See In re Petition of WorldCom, Inc., 17 FCC Rcd. 27,039 (Jul. 17, 2002) ("Virginia Arbitration Order"). There, the FCC delegated authority to the chief of one of its subdivisions, the Wireline Competition Bureau ("WCB"), to arbitrate interconnection agreement disputes between Verizon, the incumbent local telephone service provider, and three new entrants — AT & T Communications of Virginia, Inc., WorldCom, Inc. and Cox Virginia Telcom, Inc. — when the Virginia State Corporation Commission refused to do so.[8] Virginia Arbitration Order, 17 FCC Rcd at 27,044-45, ¶¶ 6, 7; see also 47 U.S.C. § 252(e)(5) (giving the FCC authority to preempt the arbitration authority of state commissions). The purpose of the WCB is to "advise[] and make[] recommendations to the Commission, or act [] for the Commission under delegated authority, in all matters pertaining to the regulation and licensing of communications common carriers." 47 C.F.R. § 0.91. As such, it has unique expertise in the area of interpreting rules promulgated by the FCC.[9]
 
 
 15
 The Virginia Arbitration Order addresses the precise issue before us — whether the geographic area test outlined in Rule 711(a)(3) requires the new entrant to actually serve, as opposed to merely be capable of serving, the same geographic area as the incumbent. 17 FCC Rcd. at 27,182-83, ¶ 304. In siding with the new entrants and determining that Rule 711(a)(3) requires that new entrants demonstrate only that they are capable of serving the same geographic area as the incumbent, the WCB stated:
 
 
 16
 [T]he determination whether a [new entrant's] switch "serves" a certain geographic area does not require an examination of the competitor's customer base.... The tandem rate rule recognizes that new entrants may adopt network architecture different from those deployed by the incumbent; it does not depend upon how successful the [new entrant] has been in capturing a "geographically dispersed" share of the [incumbent's] customers, a standard that would penalize new entrants. We agree..., therefore, that the requisite comparison under the tandem rate rule is whether the [new entrant's] switch is capable of serving a geographic area that is comparable to the architecture served by the [incumbent's] tandem switch.
 
 
 17
 Id. at 27,186-87, ¶ 309 (emphasis added).
 
 
 18
 We find the WCB's pronouncement on this issue not only persuasive, given the Act's overarching goal of promoting competition and the WCB's expertise in this area, but one requiring deference as the voice of the FCC interpreting its own rules. See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); US W. Communications, Inc. v. Pub. Serv. Comm'n of Utah, 75 F.Supp.2d 1284, 1287 (D.Utah 1999) ("[I]f the FCC were to act for a state commission that did not accept its responsibilities under the Act, a reviewing court would give deference to the FCC, as a federal agency, under Chevron."); see also Ill. Bell Tel. Co., 179 F.3d at 571 ("We have long given deference to the pronouncements of the FCC.").
 
 
 19
 According to the FCC's rules on delegation of authority, the WCB literally stepped into the shoes of the FCC when it assumed responsibility of the Virginia arbitration:
 
 
 20
 (a) The person, panel, or board to which functions are delegated shall, with respect to such functions, have all the jurisdiction, powers, and authority conferred by law upon the Commission, and shall be subject to the same duties and obligations.
 
 
 21
 (b) ... any action taken pursuant to delegated authority shall have the same force and effect and shall be made, evidenced, and enforced in the same manner as actions of the Commission.
 
 
 22
 47 C.F.R. § 0.203. See also 47 U.S.C. § 155(c)(3) ("Any order, decision, report, or action made or taken pursuant to any such delegation [of authority] ... shall have the same force and effect, and shall be made, evidenced, and enforced in the same manner, as orders, decisions, reports, or other actions of the Commission."). When, as here, Congress has expressly permitted delegation of authority by statute, see 47 U.S.C. § 155(c), and the agency delegates authority to a subdivision, "the decision of the subdivision is entitled to the same degree of deference as if it were made by the agency itself." MCIMetro Access Transmission Servs., Inc. v. BellSouth Telecomms., Inc., 352 F.3d 872, 880 n. 8 (4th Cir.2003) (citing Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 566 n. 9, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980)).
 
 
 23
 Although we recognize that actions decided by delegation of authority are subject to review by the FCC under 47 U.S.C. § 155(c) and 47 C.F.R. § 1.115, we do not believe, as Ameritech urges, that this deprives the Virginia Arbitration Order of the FCC's imprimatur as outlined above in 47 U.S.C. § 155(c)(3) and 47 C.F.R. § 0.203. Unless and until the FCC modifies the Order, it remains in effect and is entitled to our deference. 47 C.F.R. § 1.102(b) (stating that non-hearing actions such as the Virginia Arbitration Order are effective upon release and are not stayed pending a petition for reconsideration by the FCC, except in limited circumstances not present here).[10] See also MCIMetro Access Transmission Servs., Inc., 352 F.3d at 880 n. 8 (according the Virginia Arbitration Order the same deference as if it had been rendered by the FCC itself).
 
 
 24
 Ameritech does not make the alternative argument that even if the IURC applied the test appropriately, which we have found it did, the evidence presented by AT & T fails to establish that its switches have the ability to serve the same areas served by the Ameritech tandem switches. Indeed, Ameritech concedes that AT & T provided evidence supporting the IURC's findings on this issue. (See, e.g., App. Opening Br. p. 20.) Because the IURC correctly interpreted the geographic coverage test established in Rule 711(a)(3), and because Ameritech does not contest the IURC's findings of fact showing that AT & T met the test, the district court's decision upholding the IURC's determination that AT & T is entitled to the tandem reciprocal compensation rate was correct.
 
 2. Dark Fiber
 
 25
 "Dark fiber" is excess cable laid in anticipation of future use, but not currently connected to electronics, or "lit," enabling it to carry telecommunications signals. In re Implementation of the Local Competition Provisions of the Telecommunications Act of 1996, 15 FCC Rcd. 3696, 3776, ¶ 174 (Nov. 5, 1999) ("UNE Remand Order"). The act of connecting dark fiber to electronics so that it can carry a signal is called "splicing." Ameritech conceded in one of its several Federal Rule of Appellate Procedure 28(j) letters that the FCC's newest formal rulemaking, the Triennial Review Order,[11] released August 21, 2003, was "inconsistent" with its appeal arguing that it was not required to splice dark fiber upon AT & T's request because to do so would be concomitant to providing AT & T with superior, not just nondiscriminatory, access to Ameritech's network. The Triennial Review Order foreclosed that argument by explicitly stating:
 
 
 26
 We require incumbent LECs to make routine network modifications to unbundled transmission facilities used by requesting carriers where the requested transmission facility has already been constructed. By "routine network modifications" we mean that incumbent LECs must perform those activities that incumbent LECs regularly undertake for their own customers.
 
 
 27
 * * * * * *
 
 
 28
 By way of illustration, we find that loop modification functions that the incumbent LECs routinely perform for their own customers, and therefore must perform for competitors, include, but are not limited to, rearrangement or splicing of cable ....
 
 
 29
 2003 FCC LEXIS 4697 at *1025, 1027-28, ¶¶ 632, 634.
 
 
 30
 Ameritech appropriately observed in its Rule 28(j) letter that if the Triennial Review Order was in effect upon the rendering of our decision, it must be applied in this case. See Jennings, 304 F.3d at 956 ("Because the role of the federal courts is to determine whether the agreements comply with the Act, and because the FCC properly has exercised its authority to implement the Act by means of promulgating regulations, we conclude that we must ensure that the interconnection agreements comply with current FCC regulations, regardless of whether those regulations were in effect when the [state commission] approved the agreements."). The Triennial Review Order took effect on October 2, 2003. FCC Public Notice, DA 03-2844, 18 FCC Rcd. 18,516 (Sept. 8, 2003). The district court very properly analyzed the dark fiber situation, as confirmed by the Triennial Review Order.[12]
 
 B. AT & T's Appeal
 1. New Combinations of Network Elements
 
 31
 Before the IURC and in its opening brief before the district court, Ameritech argued that Iowa Utilities Board v. FCC, 219 F.3d 744 (8th Cir.2000) ("IUB III")[13] relieved it from its obligation under 47 C.F.R. § 51.315(c) to create new combinations of "unbundled network elements" ("UNEs") for AT & T. The term "network element" means a facility or equipment used in the provision of a telecommunications service, including "features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. § 153(29). "Unbundling" refers to "giv[ing] separate prices for equipment and supporting services." AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 394, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) (quoting Webster's Ninth New Collegiate Dictionary 1283 (1988)).
 
 
 32
 The Supreme Court's decision in Verizon Communications Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002), released midway through the briefing before the district court, reinstated Rule 315(c), which IUB III had vacated. Realizing the Supreme Court's decision invalidated its prior arguments, Ameritech shifted position in its district court reply brief, urging that those contested portions of the interconnection agreement dealing with unbundled network elements should be remanded for further consideration by the IURC in light of Verizon. The district court agreed, noting that the Court in Verizon recognized four limitations on Rule 315(c), that the agreement did not reflect the Court's decision regarding those limitations, and was thus inconsistent with the Act.
 
 
 33
 As a threshold matter, AT & T argues Ameritech has waived its right to rely on the Supreme Court's decision in Verizon. Even though Verizon was not decided until midway through briefing before the district court, AT & T argues that Ameritech should have anticipated its holding and presented alternative arguments before the IURC and the district court, instead of relying exclusively on IUB III, the relevant portion of which Verizon subsequently reversed. Because it did not make its Verizon-based arguments before the IURC, AT & T contends Ameritech was prohibited from doing so when it sought review from the district court. See, e.g., Southwestern Bell Tel. Co. v. Pub. Util. Comm'n of Tex., 208 F.3d 475, 487-88 (5th Cir.2000) ("The failure to raise an issue at the administrative level waives the right to appellate review of that issue."). We disagree.
 
 
 34
 "[W]here the Supreme Court decides a relevant case while litigation is pending ... omission of an argument based on the Supreme Court's reasoning does not amount to a waiver ...." Old Ben Coal Co. v. Dir., Office of Workers' Comp. Programs, 62 F.3d 1003, 1007 (7th Cir.1995) (quotation omitted). This is especially true where, as here, once Ameritech discovered that Verizon foreclosed the previous arguments made before the IURC with respect to combinations at issue in the interconnection agreement, it requested only that the district court remand the relevant sections of the interconnection agreement to the IURC for reconsideration in light of Verizon. See id. ("Moreover, waiver is a flexible doctrine, too, so that when all the claimant asks for is a remand to permit the agency to consider an intervening decision — a decision the agency couldn't have considered earlier — the doctrine does not stand in the way." (quotation omitted)).
 
 
 35
 AT & T next argues that remand is unnecessary as the IURC's decision accurately tracks Verizon. Again, we disagree. Verizon reinstated the combination rules invalidated in IUB III, 219 F.3d at 758-59, but in so doing, added an interpretive gloss to Rule 315(c) not reflected in the parties' interconnection agreement.
 
 
 36
 On its face Rule 315(c) contains only two limitations to an incumbent's duty to perform combinations of unbundled network elements — technical feasibility and discriminatory impact. It states:
 
 
 37
 (c) Upon request, an incumbent LEC shall perform the functions necessary to combine unbundled network elements in any manner, even if those elements are not ordinarily combined in the incumbent LEC's network, provided that such combination:
 
 
 38
 (1) Is technically feasible; and
 
 
 39
 (2) Would not undermine the ability of other carriers to obtain access to unbundled network elements or to interconnect with the incumbent LEC's network.
 
 
 40
 47 C.F.R. § 51.315(c). However, the Supreme Court noted that four sets of limitations applied to the combination requirements based on the language of the rules and the FCC's interpretation of them: (1) the incumbent's duty to combine only arose when the new entrant was "unable to do the job itself;" (2) the incumbent only had to "perform the functions necessary to combine" and not necessarily complete the actual combination; (3) the new entrant must pay "a reasonable cost based fee" for the incumbent's combination efforts; and (4) the incumbent only had to perform technically feasible combinations that would not discriminate against other new entrants (the two limitations specifically listed in Rule 315(c)(1) and (2)). Verizon, 535 U.S. at 535, 122 S.Ct. 1646. The Court stated:
 
 
 41
 In sum, what we have are rules that say an incumbent shall, for payment, "perform the functions necessary," 47 C.F.R. §§ 51.315(c) and (d) (1997), to combine network elements to put a competing carrier on an equal footing with the incumbent when the requesting carrier is unable to combine, First Report and Order ¶ 294, when it would not place the incumbent at a disadvantage in operating its own network, and when it would not place other competing carriers at a competitive disadvantage, 47 C.F.R. § 51.315(c)(2). Id. at 538, 122 S.Ct. 1646. In so doing, the Supreme Court more clearly delineated under what circumstances an incumbent can be required to combine unbundled network elements.
 
 
 42
 When the IURC approved the interconnection agreement between the parties, it did not have the benefit of the Supreme Court's Verizon opinion. Of the limitations incorporated by Verizon into Rule 315(c), AT & T admits that the interconnection agreement fails to reflect any finding by the IURC that Ameritech must provide combination of unbundled network elements because AT & T cannot do them itself. AT & T posits that such a limitation should be read into the agreement based on certain findings by the IURC in the arbitration order and based on testimony accepted by the IURC in making those findings. We decline to do so. The interconnection agreement as approved is inconsistent with the Act as interpreted in Verizon, and should be remanded to the IURC for reconsideration.[14]
 
 2. Acceptance testing
 
 43
 AT & T next argues that the district court's finding that Ameritech need not perform "acceptance testing" at AT & T's request because it results in providing AT & T with a network superior in quality to Ameritech's own was in error. Acceptance testing involves Ameritech's field technician conducting a noise and frequency response test prior to opening a loop circuit requested by AT & T. The purpose of the acceptance test is to ensure the line is error-free, resulting in better quality and reliability for customers.
 
 
 44
 Ameritech argued before the IURC that because it doesn't provide acceptance testing for its own retail customers, it shouldn't have to provide it for AT & T. The IURC ordered Ameritech to perform acceptance testing anyway, finding it to be in the public interest because it could reduce the need for later line maintenance, would ensure reliable, quality service to customers, and would promote competition. In doing so, the IURC acknowledged that such a requirement made Ameritech provide AT & T with better service than it provides for its own customers and that the Eighth Circuit voided the FCC rule requiring incumbents to provide superior quality networks to new entrants. See IURC Arbitration Order, No. 40571-INT-03, p. 76 (Nov. 20, 2000); IUB I, 120 F.3d at 812-13; see also IUB III, 219 F.3d at 758. To avoid the federal ban on superior quality requirements, the IURC relied on its authority under state law as preserved by the Act to independently impose the acceptance testing requirement on Ameritech. IURC Arbitration Order at 76-77 (relying upon 47 U.S.C. § 251(d)(3) and citing MCI Telecomms. Corp. v. U.S. W. Communications, 204 F.3d 1262, 1265 (9th Cir.2000)). It stated:
 
 
 45
 Therefore, while the FCC is limited to promulgating rules that are not contrary to the plain meaning of the Act, as a state commission we must only prescribe regulations that are consistent with the Act. States can "raise the bar" of the telecommunications providers['] standards, provided the bar does not conflict with the Act.
 
 
 46
 Id. at 77-78 (emphasis in original).
 
 
 47
 The district court disagreed with the IURC's interpretation of the power granted to it under the Act in this instance and reversed the acceptance testing requirement as being in conflict with the Act, relying upon IUB III's statement that "[s]uperior quality requirements `violate the plain language of the Act.'" (Dist. Ct. Op. at 16) (quoting IUB III, 219 F.3d at 758). The district court criticized the IURC for advancing the seemingly incompatible theorem that "state commissions can order requirements that `violate' the Act, as long as the requirements do not `conflict' with the Act." Id. (citing IURC Arbitration Order at 77-78). The IURC's recitation of the role reserved for it under the Act was, as the district acknowledged, inartful, but its decision to require Ameritech to provide acceptance testing neither conflicts with nor violates the Act. It thus must be reinstated.
 
 
 48
 Prior to the passage of the Act, the states had primary regulatory control over local telecommunications markets. Ill. Bell. Tel. Co., 179 F.3d at 568. Although it now federalizes regulation of the telecommunications field in the name of competition, the Act recognizes and specifically preserves state authority to continue to regulate locally, as long as the regulations promote, and do not conflict with, the stated goals and requirements of the Act on its face or as interpreted by the FCC:
 
 
 49
 Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.
 
 
 50
 47 U.S.C. § 261(c). Conversely, the FCC, in implementing regulations animating the Act, cannot scuttle state regulations consistent with the Act:
 
 
 51
 In prescribing and enforcing regulations to implement the requirements of this section, the Commission shall not preclude the enforcement of any regulation, order, or policy of a State Commission that —
 
 
 52
 (A) establishes access and interconnection obligations of local exchange carriers;
 
 
 53
 (B) is consistent with the requirements of this section; and
 
 
 54
 (C) does not substantially prevent implementation of the requirements of this section and the purposes of this part.
 
 
 55
 47 U.S.C. § 251(d)(3). The Act provides specifically, with regard to the state's role in approving interconnection agreements, that "[n]othing in this section shall prohibit a State commission from establishing or enforcing other requirements of State law in its review of an agreement, including requiring compliance with intrastate telecommunications service quality standards or requirements." 47 U.S.C. § 252(e)(3).
 
 
 56
 Based on the plain language of the Act, it's clear the IURC had independent authority preserved under the Act to impose acceptance testing requirements on Ameritech by way of the interconnection agreement. As the IURC found, the requirement promoted competition and enhanced service quality for Indiana consumers and thus was consistent with the Act. Cf. Ill. Bell Tel. Co., 179 F.3d at 574 (noting that deference to state commission decisions is not improper considering the "important role" left to them by the Act in the field of interconnection agreements).
 
 
 57
 Ameritech argued, and the district court found, that regardless of any independent state authority that may have survived the Act, the IURC's imposition of acceptance testing is barred by the logic of the Eighth Circuit's decisions relating to the now void FCC "superior quality" regulation. According to the Act, incumbents must provide interconnection to new entrants "that is at least equal in quality" to that enjoyed by the incumbent itself. 47 U.S.C. § 251(c)(2)(C) (emphasis added). The FCC promulgated a regulation requiring that the incumbent provide superior quality interconnection upon the new entrant's request. IUB I, 120 F.3d at 812 (citing now vacated 47 C.F.R. § 51.305(a)(4)). The Eighth Circuit found that the plain language of the Act could not support a superior quality requirement; rather, the phrase "at least equal" mandated only that the quality be equal, not superior. Id. at 812-13. "In other words, it establishes a floor below which the quality of the interconnection may not go." Id. at 812. The regulation, on the other hand, inappropriately substituted the ceiling (superior quality) for the floor (equal quality), by requiring superior quality upon request. The Eighth Circuit reaffirmed its position on the superior quality rules in IUB III, 219 F.3d at 758.
 
 
 58
 As already explained, the roles — and the authority — of the state commissions and the FCC are distinct under the Act. Hence, we do not agree with the premise advanced by Ameritech that because the FCC may not implement a blanket regulation requiring superior quality, the IURC may not require acceptance testing when, after individualized review, it finds it to be in the public interest and a means of promoting competition in Indiana. The Eighth Circuit's prohibition of superior quality mandates applied only to the FCC in its role as federal regulator, not to the IURC in its role as state regulator. We find that the IURC's imposition of the acceptance testing requirement does not conflict with the spirit and purpose of the Act and is an appropriate use of the state law authority left to it under the Act.
 
 
 59
 Further, the IURC's requirement that Ameritech provide acceptance testing does not "violate" the plain meaning of the Act, since the Act states that the quality provided by the incumbent must be "at least equal." 47 U.S.C. § 251(c)(2)(C). The "at least" indicates that something more than equal is allowable. See IUB I, 120 F.3d at 812; see also MCI Telecomms. Corp. v. N.Y. Tel. Co., 134 F.Supp.2d 490, 506 (N.D.N.Y.2001) (determining that Act's "at least equal" language allows state commissions to set quality guidelines superior to those the incumbent provides itself); AT & T Communications of the S. States, Inc. v. GTE Fla., Inc., 123 F.Supp.2d 1318, 1329 (N.D.Fla.2000) (upholding imposition of superior quality interconnection in part because Act's "at least equal" provision does not mean "no greater than").
 
 
 60
 Because the IURC acted under authority preserved by the Act and required Ameritech to provide superior quality access allowed under the Act, the district court's determination otherwise must be reversed.
 
 3. Packet Switching
 
 61
 As we have discussed, the Act is dynamic legislation, subject to ever-evolving interpretation based on FCC and court pronouncements. The parties' dispute with regard to the IURC's "packet switching" unbundling requirement highlights the fluidity of the law, resulting in our affirmance of the learned district judge's remand order on this issue, but on different grounds.
 
 
 62
 The IURC considered "packet switching," a type of network element, to be one that must be made available by Ameritech to AT & T on an unbundled basis. According to the FCC regulations in effect at the time the parties entered into the interconnection agreement, packet switching unbundling was required only when four specific conditions were met. 47 C.F.R. § 51.319(c)(5)(i)-(iv). The district court observed that the IURC did not appear to consider those four factors in ordering the unbundling of packet switching and remanded so that the proper inquiry could be made. AT & T appealed, arguing that the regulation did not foreclose states from ordering unbundling in circumstances other than those listed in the regulation.
 
 
 63
 The FCC regulation in question, 47 C.F.R. § 51.319(c)(5) (i)-(iv), has since been remanded to the FCC by the D.C. Circuit. See U.S. Telecom Ass'n v. FCC, 290 F.3d 415 (D.C.Cir.2002), cert. denied, WorldCom, Inc. v. U.S. Telecom Ass'n, 538 U.S. 940, 123 S.Ct. 1571, 155 L.Ed.2d 344 (2003). After the parties finished briefing their appeals in the instant case, the FCC issued its Triennial Review Order. As required by the D.C. Circuit, the Order specifically addressed packet switching unbundling determining that it need never be unbundled, even in the limited circumstance previously outlined in 47 C.F.R. § 51.319(c)(5):
 
 
 64
 We find, on a national basis, that competitors are not impaired without access to packet switching, including routers and DSLAMs. Accordingly, we decline to unbundle packet switching as a stand-alone network element. We further find that the Commission's limited exception to its packet-switching unbundling exemption is no longer necessary.
 
 
 65
 Triennial Review Order, 2003 FCC LEXIS 4697, at *888, ¶ 537. The FCC based its determination on evidence that competitors regularly deployed their own packet switches without significant barriers, making unbundled access to the incumbents' unnecessary. Id. at *889-92, ¶¶ 538-39.
 
 
 66
 In spite of the Order, AT & T continues to argue that states still maintain authority to order the unbundling of packet switching and that, in any event, we are obligated to apply the law as it existed at the time of the agreement. As to the latter point, AT & T makes much of the Order's refusal to unilaterally change all interconnection agreements to comply with the new unbundling requirements. The FCC defers instead to telecommunications providers' interconnection agreement provisions establishing procedures for dealing with changes in the law; where the providers have not negotiated the procedure to follow when the law changes, the FCC directs providers to the default provisions of the Act regarding the same. Id. at *1112-13, ¶ 701. By favoring change through the interactive process espoused by the Act, we do not understand the FCC to advocate a bar to this court's ability to apply the law as it currently stands. Further, we are obligated to do so:
 
 
 67
 Because the role of the federal courts is to determine whether the agreements comply with the Act ..., we conclude that we must ensure that the interconnection agreements comply with current FCC regulations, regardless of whether those regulations were in effect when the [state commission] approved the agreements.
 
 
 68
 See Jennings, 304 F.3d at 956.
 
 
 69
 As to AT & T's insistence that the Triennial Review Order does not preempt the state's authority under state law to order packet switching unbundling, we find that the Order does not entirely foreclose this argument. The Order explicitly states: "We do not agree with incumbent LECs that argue that the states are preempted from regulating in this area as a matter of law." Triennial Review Order, 2003 FCC LEXIS 4697, at *305, ¶ 192.
 
 
 70
 Therefore, we affirm the district court's remand of this issue to the IURC. We note, however, that the IURC's further findings should be guided by the Triennial Review Order, not the now invalid 47 C.F.R. § 51.319(c)(5) as ordered by the district court.
 
 
 71
 That said, we observe that only in very limited circumstances, which we cannot now imagine, will a state be able to craft a packet switching unbundling requirement that will comply with the Act. As stated by the FCC:
 
 
 72
 If a decision pursuant to state law were to require the unbundling of a network element for which the Commission has either found no impairment — and thus has found that unbundling that element would conflict with the limits in section 251(d)(2) — or otherwise declined to require unbundling on a national basis, we believe it unlikely that such a decision would fail to conflict with and "substantially prevent" implementation of the federal regime, in violation of section 251(d)(3)(c).
 
 
 73
 Id. at *311, ¶ 195.
 
 III. Conclusion
 
 74
 We AFFIRM the district court's determinations as to tandem reciprocal compensation rates, dark fiber, new combinations of network elements, and packet switching on the grounds, and with the caveats, discussed above. We REVERSE the district court's determination on acceptance testing, reinstating that provision of the interconnection agreement as a valid exercise of state authority preserved under the Act.
 
 
 
 Notes:
 
 
 *
 Chief Judge Joel M. Flaum, Judge Kenneth F. Ripple, Judge Ilana Diamond Rovner and Judge Ann Claire Williams did not participate in the consideration of this petition
 
 
 [1]
 The Telecommunications Act of 1996, Pub.L. 104-104, 110 Stat. 56 (1996) is codified as amended in scattered sections of Title 47, United States Code
 
 
 [2]
 The IURC actually arbitrated two agreements — one between AT & T Communications of Indiana, GP and Ameritech and the other between TCG Indianapolis and Ameritech. Both agreements are identical in all material respects and are challenged on identical grounds. For simplicity's sake, we will follow the parties' and district court's lead and refer to the agreements at issue in the singular
 
 
 [3]
 The IURC Commissioners, although named in the underlying complaint for declaratory and injunctive relief and appealing separately here, provided no briefing or oral argument separate from AT & T's. References in this opinion to AT & T as a party should also be understood to include the Commissioners
 
 
 [4]
 In the parlance of the Act, incumbent local telephone service providers are called "incumbent local exchange carriers," abbreviated "ILECs" or "incumbent LECs." 47 U.S.C. § 251(h);see MCI Telecomms. Corp. v. Mich. Bell Tel. Co., 79 F.Supp.2d 768, 772 (E.D.Mich.1999).
 
 
 [5]
 Similarly, new market entrants are commonly referred to as "competing local exchange carriers," abbreviated "CLECs" or "competing LECs."See MCI Telecomms. Corp., 79 F.Supp.2d at 772.
 
 
 [6]
 Local exchange networks consist of local loops (the cables that connect telephones to switches), switches (computers that direct calls to their destinations), and transport facilities (equipment that directs calls between switches)Id. at 771.
 
 
 [7]
 Rule 711(a)(3) reads in full:
 Where the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate.
 
 
 [8]
 In refusing to arbitrate the providers' interconnection agreement disputes, the Virginia State Corporation Commission stated that it could not apply federal standards as required by the Act in arbitrating interconnection agreements without potentially waiving its Eleventh Amendment sovereign immunity, which it did not have the authority to doVirginia Arbitration Order, 17 FCC Rcd. at 27,045, ¶ 6.
 
 
 [9]
 According to 47 C.F.R. § 0.91, some additional functions of the WCB are as follows:
 The Bureau will, among other things:
 (a) Develop and recommend policy goals, objectives, programs and plans for the Commission in rulemaking and adjudicatory matters concerning wireline telecommunications, drawing on relevant economic, technological, legislative, regulatory and judicial information and developments. Overall objectives include meeting the present and future wireline telecommunications needs of the Nation; fostering economic growth; ensuring choice, opportunity, and fairness in the development of wireline telecommunications; promoting economically efficient investment in wireline telecommunications infrastructure; promoting the development and widespread availability of wireline telecommunications services; and developing deregulatory initiatives where appropriate.
 (b) Act on requests for interpretation or waiver of rules.
 (c) Administer the provisions of the Communications Act requiring that the charges, practices, classifications, and regulations of communications common carriers providing interstate and foreign services are just and reasonable....
 
 
 [10]
 We note that on August 16, 2002, Verizon filed a petition seeking reconsideration of portions of theVirginia Arbitration Order, including the interpretation of Rule 711(a)(3). See Verizon's Petition for Clarification and Reconsideration of July 17, 2002 Memorandum Opinion and Order, p. 23, available at http://gullfoss2.fcc.gov/prod/ecfs/retrieve.cgi? native_or_pdf=pdf & id_document= 6513288259. However, the FCC has not yet ruled on the petition, and the Virginia Arbitration Order remains in effect.
 
 
 [11]
 See In re Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers, 2003 FCC LEXIS 4697 (Aug. 21, 2003) ("Triennial Review Order"); see also 68 Fed.Reg. 52,276 (Sept. 2, 2003).
 
 
 [12]
 As this case was going to press, the D.C. Circuit decidedU.S. Telecom Assoc. v. FCC, 359 F.3d 554 (D.C.Cir.2004), which reviewed the legality of certain provisions of the Triennial Review Order, including the network modification requirements cited above. The D.C. Circuit expressly upheld the Order's requirement that incumbents provide new entrants with routine network modifications that incumbents regularly undertake for their own customers, such as splicing dark fiber. Id. at 592-93.
 
 
 [13]
 After the FCC promulgated its initial regulations under the Act in 1996, several parties filed petitions for review of those regulations in several different federal circuits. Under the Hobbs Act, the Federal Courts of Appeals have exclusive jurisdiction over challenges to FCC regulationsSee 28 U.S.C. § 2342; 47 U.S.C. § 402(a). And, when agency regulations are challenged in more than one court of appeals, 28 U.S.C. § 2112 requires that the panel on multi-district litigation consolidate the petitions and assign them to a single circuit — here, the Eighth Circuit. It issued its first opinion in 1997, vacating certain contested FCC regulations. See Iowa Utils. Bd. v. FCC, 120 F.3d 753 (8th Cir.1997) ("IUB I"). The Supreme Court granted certiorari, reinstated all but one of the previously vacated regulations, and remanded to the Eighth Circuit for additional proceedings. See AT & T Corp. v. Iowa Utils. Bd., 525 U.S. 366, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999) ("IUB II"). The Eighth Circuit then issued Iowa Utils. Bd. v. FCC, 219 F.3d 744 (8th Cir.2000) ("IUB III"), which was subsequently reviewed and reversed in part in Verizon Communications Inc. v. FCC, 535 U.S. 467, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002). See MCI Telecomms. Corp. v. U.S. W. Communications, 204 F.3d 1262, 1267 (9th Cir.2000) (describing in part the history of the Eighth Circuit litigation).
 
 
 [14]
 Other limitations delineated by the Supreme Court appear on the face of the interconnection agreement provisions in issue or are otherwise satisfied. For example, subsection 9.3.3 of the interconnection agreement addressing the combination of elements not ordinarily combined specifically states that Ameritech shall perform the functions necessary to combine its network elements, but only if technically feasible and non-discriminatory. Although subsection 9.3.3 does not specifically mention payment for the combination efforts, that issue is clearly addressed elsewhere in the interconnection agreement
 We also note that Ameritech argues that subsection 9.3.2.1 of the interconnection agreement addressing combinations of elements ordinarily combined has also been called into question under Verizon. We leave it to the IURC to determine in the first instance whether this section comports with the Act as interpreted by the Supreme Court.